[Cite as *State v. Taylor*, 2013-Ohio-186.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                              :

    Plaintiff-Appellee              :           C.A. CASE NO.    23990

v.                                         :           T.C. NO.    08CR1087

GUDONAVON J. TAYLOR                        :           (Criminal appeal from
                                                       Common Pleas Court)

    Defendant-Appellant             :

                                           :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ___25th___ day of ___January___, 2013.

. . . . . . . . . .

KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

ENRIQUE G. RIVERA-CEREZO, Atty. Reg. No. 0085053, 765 Troy Street, Dayton, Ohio 45404
    Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}**   This matter is before the Court on the Notice of Appeal of Gudonavon

Taylor. Taylor's appeal was originally filed by counsel for Taylor on April 19, 2010. Pursuant to *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.E.2d 493 (1967), original appellate counsel for Taylor asserted that there were no meritorious issues for review. Taylor then filed a pro se brief, asserting nine assignments of error, and an amended brief, asserting one additional assignment of error, and this Court concluded that six of Taylor's assigned errors had arguable merit. This Court appointed new counsel for Taylor, who asserts three assigned errors herein.

{¶ 2} On April 7, 2008, Taylor was indicted on three counts of murder, two counts of felonious assault, and one count of having weapons while under disability, each with a three-year firearm specification. On April 18, 2008, Taylor was charged by indictment with an additional charge of discharging a firearm on or near prohibited premises, with a three-year firearm specification. On May 6, 2008, Taylor filed a Motion to Suppress Pretrial Photographic Identification, and a hearing was held on October 14, 2008. On January 29, 2009, Taylor filed a second motion to suppress. On September 9, 2009, the State filed a motion requesting that the court rule on Taylor's motions to suppress along with a memorandum in opposition to the motions. On October 2, 2009, the trial court overruled Taylor's motions, except that it withheld its ruling relating to one witness, Iletha Veney, until the witness could be produced by either party.

{¶ 3} On January 5, 2010, Taylor filed a motion to suppress all records relating to a specific cell phone number, and on January 20, 2010, he filed a supporting memorandum, which the State opposed. On February 2, 2010, the trial court overruled the motion.

{¶ 4} On March 9, 2010, the State filed a motion to exclude evidence. On March

19, 2010, Taylor filed a motion in limine, and he filed a second liminal motion on March 22, 2010. The State filed a motion in limine on March 22, 2010.

{¶ 5} Following a jury trial on all charges except having weapons while under disability, Taylor was found guilty of each offense and specification. Following a bench trial, Taylor was found guilty of having weapons while under disability. The court sentenced Taylor to an aggregate term of 41 years to life.

{¶ 6} The events giving rise to this matter occurred on December 7, 2007, when Taylor, also known as DonDon, shot and killed Jerod Bryson, also known as JB, after an argument over drugs and money that began at 116 East Lincoln Street, a boarding house in Dayton, and ended with Bryson's death on nearby Warren Street. Taylor was 18 years old at the time of the shooting.

{¶ 7} At trial, Susan Allen, a forensic pathologist from the Miami County Coroner's Office, who performed an autopsy on Bryson, testified that she recovered seven bullets from Bryson's body, namely two from his back, one from his right hand, one from the left side of his chest, one from the right side of his head, one from his pelvis, and one from his neck. She stated that she found 14 separate and distinct entrance wounds to Bryson's body, and she testified that Bryson died of "multiple gunshot wounds of the head and torso."

{¶ 8} On cross-examination, defense counsel asked Allen if, "in part of your training and your experience you do and have learned and analyzed the effects that certain drugs can have on the body?" Allen answered affirmatively and then stated, "my area of focus is on the presence or absence of drugs after death and not particularly what the effects

are while the person is living. A toxicologist would perhaps be able to address behavior, for example, while the person is alive." The following exchange occurred:

Q. Doctor, I had asked you whether or not cocaine * * * affects the brain * * * when you ingest the cocaine * * *. What does it affect within the body. You're aware that it affects the brain, are you not, Doctor?

A. Well, the drug is going to go through your bloodstream, so it will have an effect on, you know, many different areas of your body. During the autopsy looking at the brain and - - you know, grossly, just with your eye, and then later looking at the brain underneath the microscope, you cannot see an effect of cocaine use. If there is something that is happening during life, that is possible, but again, a toxicologist would better be able to address that question.

Q. * * * are you aware of any studies or articles that have indicated that cocaine constricts the blood vessels within the brain?

* * *

A. I'm sure that cocaine does constrict blood vessels. If you're specifically talking about the brain and specific articles, no, I'm not aware of a specific article.

* * *

Q. And as part of your work at the Coroner's Office and part of your scientific background and your education and your experience, you are aware, are you not, Doctor, that the constriction of blood vessels within the brain

affects your memory?

A.  I - - I'm not going to address a question about behavior and memory.  A toxicologist could better answer that question.

{¶ 9}  Defense counsel then inquired whether Allen was familiar with two articles involving the physiological effect of crack cocaine on an individual's memory. Allen viewed the articles, namely Defendant's Exhibits A and B, and then stated that she was unfamiliar with them. Exhibit A is an article entitled "How Does Cocaine Affect the Body?" by Traci Vandermark, a "student of health, fitness and nutrition at the International Institute of Holistic Healing," which was published at Livestrong.com, and Exhibit B is entitled, "Researchers See how Cocaine Affects The Brain," by William Cromie, which was published in the Harvard University Gazette in 1998.   After viewing the articles, Allen stated, "If you would like for me to review the articles, I would be happy to review and give an opinion if I can.  I would have to read the articles in order to render an opinion." Defense counsel asked her to "take the time now to review" the articles, and the court instructed, "[w]e're not going to take the time to review that.  The witness has testified she's not familiar with it."

{¶ 10}  On redirect examination, the following exchange occurred:

Q.  You don't have specific expertise on how drugs, albeit cocaine or other drugs, affect a living person's behavior?

A.  That's right.

{¶ 11}  Louise Tamlyn, who was the only resident of 116 Lincoln Street, testified that she allowed Taylor and Bryson to sell drugs from the common area of the home in

exchange for crack cocaine. According to Tamlyn, on the evening of December 7, 2007, around 8:00 p.m., Taylor, Bryson, another man named "V," and his girlfriend, Brittany, were drinking and "shooting crap" in the common area of the home when they "commenced arguing." At the time, Tamlyn was in her bedroom, which was adjacent to the common area, with her door open. She stated that "[m]ainly DonDon and JB" were arguing about "[m]oney and territory." Tamlyn stated that she asked them to "quiet down," and when the arguing "erupted louder again," she told everyone to leave. Tamlyn stated that everyone left through the front door, and that Taylor and Bryson continued arguing for 10 or 20 minutes. Tamlyn testified that she went upstairs to use the bathroom, at which time the arguing "seemed to quiet down."

{¶ 12} When Tamlyn returned to the first floor, she testified that she heard two gunshots. Tamlyn stated that she looked out of the side window of the home toward the intersection of Lincoln and Warren Streets, and she observed "JB dancing from foot to foot out in the middle of the street," and no one else. Tamlyn stated that she proceeded to her front door, which she opened. Tamlyn stated that she observed "a man in black slacks or jeans and a black parka coat with a fur hood running across the field" across the street from her home. Tamlyn testified that she observed "JB fall to the ground" at 238 Warren Street. Tamlyn stated that she heard "five to seven shots," and that she "see the man run back through here. And there happens to be a streetlight there and I had my porch light on. I see the side of the face and I see the orange lining and I see DonDon come back through the field." Tamlyn stated that she did not see anyone else besides Taylor and Bryson. Tamlyn stated that the five to seven shots she heard were subsequent to the two she initially heard,

and that at the time they were fired, Bryson was on the ground and Taylor was "standing in front of JB." Tamlyn stated that her porch light was on at the time, and that a streetlight also illuminated the area. Tamlyn stated that she was wearing her glasses when she opened her front door.

{¶ 13} Tamlyn stated that on the evening of the incident, Taylor was wearing a parka with a fur-trimmed hood and an orange lining, "V" was wearing a "black jacket" without fur around the hood, and Bryson was wearing a "Carhart" jacket that was beige in color. Tamlyn stated that she did not observe a gun in Taylor's possession. She stated that after Taylor ran back across the field, she heard a car door slam "further down Lincoln past my house on the opposite side of the street, and it sounded like it proceeded down toward Main Street."

{¶ 14} According to Tamlyn, she bought or was given crack cocaine by both Taylor and Bryson on the date of the incident, and she smoked crack cocaine twice that day at about 4:30 and 8:00 p.m. Tamlyn stated that a "crack high" lasts about "a half an hour." Tamlyn stated that she was "not at all" high when she heard the gunshots and observed Taylor running across the field. After she heard the car leave the scene, Tamlyn stated that she put her boots on, left her home and approached Bryson, who was "laying on his back" in the area of 238 Warren Street. Tamlyn stated that before she reached Bryson, she observed the owner of a nearby "catering place," known as Benham's, and she asked him to call 911. Tamlyn stated that she then observed a police cruiser, which she flagged down, and she stated that she showed the officer Bryson's body, which had holes "in his head, shoulder and his chest." Tamlyn stated that Bryson was "barely breathing at the time."

{¶ 15} According to Tamlyn, Chris Brown approached the scene, and the officers asked her if he was the man who shot Taylor, and Tamlyn responded negatively. Tamlyn stated that she did not observe Brown at the shooting. In speaking with the responding officer on the night of the shooting, Tamlyn testified that she did not tell them everything that she had observed or identify Taylor or Bryson because she was scared. Tamlyn stated that she subsequently provided Taylor's name to police on December 10, 2007, and she identified Taylor in a photo spread at the Safety Building on December 17, 2007. Tamlyn identified State's Exhibit 46 as the coat worn by Taylor on the night of the shooting.

{¶ 16} On cross-examination, Tamlyn stated that in the six months prior to the shooting, she used crack cocaine two or three times a month, and she did not consider her usage to be "regular." She stated that she suffers from bipolar disorder, anxiety and post traumatic stress disorder and takes medication prescribed by a psychiatrist.

{¶ 17} Tamlyn stated that she met Brown "through JB and DonDon," and that Brown "had been in and out of the house bringing DonDon and JB customers" on the day of the shooting, and that he had been there "after dark." She stated that Brown arrived on the scene approximately eight minutes after she flagged down the police officer, and that he was alone. Tamlyn stated that Brown asked her what had happened, and that she told him "JB had got shot" while out of the earshot of the police officers. Tamlyn stated that when Taylor ran back across the field, she observed the orange lining of his parka, as well as the side of his face.

{¶ 18} On redirect examination, Tamlyn stated that on the night of the shooting, "V" and Brown wore jackets that came to their waists, and that Taylor's jacket was below the waist. Tamlyn acknowledged that at a probable cause hearing on March 11, 2008, she

described Taylor's coat as "'a black thigh-waist hooded parka.'"

{¶ 19}    On recross-examination, Tamlyn stated that she closed her front door when Taylor ran back across the field after shooting  Bryson, because he would have been able to see her face since the area was illuminated by the streetlight and porch light.   She stated that the crack cocaine that she smoked on the day of the incident in combination with her prescription medication did not affect her ability to perceive, understand and remember the events of the evening.

{¶ 20}    Chris Brown testified that he witnessed the shooting.   At the time of trial, he was incarcerated at the Montgomery County Jail.   He testified that on the night of the shooting, in exchange for crack cocaine, he was acting as a "runner," bringing customers to Bryson and Taylor to purchase crack cocaine.   Brown stated that he smoked some crack that night which Bryson and Taylor gave him, and that at that time he was smoking crack every day.   On December 7, 2007, Brown stated that Taylor was dropped off by his step-father at the Lincoln Street address.   Brown testified that on that date he was present inside the Lincoln Street address with Taylor, Bryson, "V," and his girlfriend, Brittany.   Regarding the argument that preceded the shooting, Brown testified that "JB break up V and his girl from fighting.   And then he start getting at DonDon and everything, and then he threaten DonDon, said he was going to get his gun and bring it down there and do something."   Brown stated that Bryson and Taylor argued about money from the drug sales. After Tamlyn told them to leave, Brown stated that Taylor, "V" and his girlfriend got into a car and left "for like six minutes."   Brown stated that when the vehicle returned, Taylor got out of the car, and Brown stated that he walked towards Taylor and said "'Man, you need to let

everything go.'" Brown stated that Taylor "kept walking, and JB was standing right there," and Taylor shot Bryson. According to Brown, Bryson "get back up and cross the street. He was on his cell phone. And I seen DonDon went back across following behind him and pushed him down to shoot him some more." Brown stated that he heard a total of eight shots. Brown stated that he "went towards like the Gospel Mission. I went up a little more till I seen [Taylor] run back across field and get in the car and they took off."

{¶ 21} Brown testified that after Taylor drove away, he "went back slowly to the corner. Then I crossed over and went checking on him. And I was scared like walking up on him and I was - - just started crying. And the police pulled up, told me to put my hands up." Brown stated that he did not see Tamlyn as he approached Bryson. Brown stated that he was placed in a cruiser and was not truthful to officers about what he had seen. Brown stated that he observed Tamlyn when he was in the back of the cruiser. He stated that he was arrested on an outstanding warrant, and that he later told the police that Taylor killed Bryson. Brown stated that Taylor wore dark clothes and a "jacket with a hoodie with fur around it " on the date of the shooting. Brown identified Exhibit 46 as Taylor's jacket. Brown stated that the crack cocaine he smoked did not affect his ability to perceive and remember the shooting.

{¶ 22} Finally, Brown testified that he had contact with Taylor in the Montgomery County Jail within the last two weeks before trial, and Brown stated that Taylor told him, "'Don't testify' - - he said my name was in his discovery packet. He said don't testify against him because his life is on the line. And he said if I - - if I don't testify against him he'll have his girl put $40 on my books."

{¶ 23} Larry Harris testified that at the time of the shooting, he resided at the Marvin Gardens Apartments on Warren Street, on the second floor. Harris stated that he knew Bryson and Taylor and had bought crack cocaine from them on Lincoln Street. He testified that Taylor and "V" came to his apartment at about 6:00 p.m. on the date of the shooting, and that they "started to gamble. Smoking weed, drinking." Harris stated that Albert Wynn, who is Bryson's brother, also came by his apartment. Harris stated that he owed Wynn five dollars, and that he gave him the money and told him to leave. He stated that his landlord appeared at about 9:00 p.m., and that she told Taylor and "V" to leave. Harris stated that he later went to the hospital and was not home when the shooting occurred.

{¶ 24} Robert Hankey testified that he is a director of an alternative education program called Twilight School at Wayne High School, and that the program is offered from 3:00 to 5:00 p.m. Hankey stated that Taylor was a student in the program, and that on the date of the shooting, Taylor "took a half-day and he was dismissed early" at 4:00.

{¶ 25} Michael Daborde testified that he is a homicide detective with the Dayton Police Department, and that he conducted a follow-up investigation of the shooting. Daborde stated that while he was interviewing Taylor, on December 11, 2007, Taylor's mother arrived at the Safety Building "wearing a coat that fit a description that we had had from the initial scene of the homicide." He stated that the coat "was black with a fur hood." According to Daborde, the coat "didn't appear to fit her. So we thought that to be strange." Daborde testified that he took the coat from Taylor's mother, and he identified Exhibit 46 as that coat.

{¶ 26} Albert Wynn testified that Bryson was his younger brother. Wynn testified

that he went to the home of Larry Harris, "to collect money on a drug debt" on December 7, 2010, at approximately 6:30 p.m. At the time, Wynn stated that he observed Taylor at the apartment with "V" shooting dice. He further stated Bryson stopped by the apartment while he was there, and that he and Bryson left the apartment together and then went their separate ways, with Bryson walking toward Lincoln Street.

{¶ 27} Danyelle Allen, Bryson's girlfriend, testified that she received a call on her cell phone from Bryson at around 8:30 p.m on December 7, 2007, and according to her caller ID, the call was placed from Taylor's cell phone.

{¶ 28} Adrian Uloho testified that he witnessed a shooting on December 7, 2007, from his apartment on Warren Street. He stated that he looked out of his window and observed two men across the street, and that one of the men shot the other one. He stated that the area where the men stood was well lit. Uloho stated that after the man was shot, he got up and walked in the direction of Uloho's apartment. According to Uloho, the shooter followed the victim, and the "guy that got shot, when he sees him, he falls to the ground." Uloho stated that he heard the shooter say, "Did I get you?" and "Why did you try to play me?" Uloho stated that he did not observe anyone else in the area except the shooter and the victim. Uloho stated that after the victim fell to the ground, the shooter stood over him and shot him at least four more times. Uloho then observed the shooter "running across the street." On cross-examination, Uloho stated that he had met Bryson once before, but he did not see his face well enough to identify him on the night of the shooting.

{¶ 29} Dayton Police Detective Michael Galbraith testified that he was dispatched to the scene of the shooting on December 7, 2007, after 11:00 p.m, and that when he arrived,

Bryson's body had already been removed. Galbraith stated that the area was well lit, and he observed footprints in the snow heading in the direction of Lincoln Street from Warren. Galbraith testified that the Dayton Police have a policy to not release the name of homicide victims until after their family is notified, and that Bryson's family was notified on the 8th of December, and that the shooting was reported in the Dayton Daily News on the 9th of December. Galbraith stated that he interviewed Tamlyn on December 10, 2007, and that she provided Taylor's name to him. Galbraith stated that he interviewed Taylor on December 11, 2007, after he observed him talking on his cell phone on Warren Street where Galbraith had returned to continue the investigation. Galbraith stated that when he observed Taylor at that location, he called for additional officers, and when approached, Taylor identified himself as Gudonovan Taylor and agreed to go with the uniformed officers to the station.

{¶ 30} After advising Taylor of his *Miranda* rights, Galbraith questioned Taylor about his presence at the scene of the crime on December 7, 2007, and his use of the name DonDon, both of which Taylor denied. Taylor's mother arrived in the course of the interview, and Galbraith "immediately noticed that she was wearing an oversize parka" that was "too big for her and it was dark colored with fur around the collar." Galbraith stated that he and Daborde "conferred about it and both thought that it was very like and similar to one that was described." Galbraith stated that he advised Taylor's mother that the coat "appeared to be evidence at this point and that I needed it." Galbraith took possession of the coat, and he identified it as State's Exhibit 46. Galbraith stated that he interviewed Tamlyn on December 17, 2007, and that she identified Taylor in a photo spread of six photos "right away."

{¶ 31} James Wright testified that in November, 2009, while he was incarcerated at the Montgomery County Jail, he came into contact with Taylor, from whom he had previously bought drugs. Wright heard Taylor state that he had returned to the Lincoln Street address after Bryson's murder, and that "he seen that the detectives were there. So, he proceeded up the street to the phone, he didn't say what kind of phone. He just said the phone. And he said then he seen an unmarked cruiser coming towards him so he got rid of the weapon that he had." Wright stated that Taylor indicated that detectives approached him and questioned him. Wright stated that Taylor also "said he was going to have his family come in and say he did not have his cell phone with him. He did not have his cell phone, he loaned it to a friend and that he going to - - that they were going to say he was at his mother's house."

{¶ 32} Taylor, who was nineteen at the time of trial, presented an alibi defense. Latoya Stewart testified that Taylor is the brother of her boyfriend, Gujaun Payton. She stated that she saw Taylor on December 7, 2007 at his mother's house in Huber Heights. According to Stewart, she went to the home after school to spend the weekend with Payton. She stated that she arrived "after 6:30, maybe 7:00," and that Taylor arrived 30 minutes later. Stewart testified that upon her arrival, Shabrandia Walder, Taylor's girlfriend, "had did my hair in the bathroom." According to Stewart, Taylor's "mom was cooking dinner, chicken. We walked to Speedway to get some snacks." She stated that she, "Gujuan, Gudonavon, Guquaya, and Shabrandia" walked to Speedway together. Afterward, they returned home for dinner, and "then my boyfriend and Gudonavon played a game in his room. We all just played a game and laid down and watched TV." Stewart stated that they

stayed up until 12:00, and that Taylor never left the residence.

{¶ 33}   Shabrandia Walder testified that she is Taylor's girlfriend.   She stated that Taylor lives in Huber Heights with his "mother, Gloria Close, Tommy Close, his stepfather, his little brother, Elsie Lorenzo Close, his sister, Guquaya Payton."   In December, 2007, Walder stated that she was "staying over there at Gloria Close's house."   On December 7, 2007, Walder stated that Taylor arrived at the home at "around 8:00" p.m., and that she "was still doing my hair because I had just finished doing Latoya's hair.   I was doing my hair in the restroom.   He walked in, said, 'What's up?'   He went in his room and played the video game for a while.   And then after I finished up a little with my hair, we both walked to Speedway, all of us."   After returning to the home and having dinner, Walder stated "we all came in Don-Don's room and played the game" on Taylor's "Xbox 360 * * * Something like that."   Walder stated that she did not leave Taylor's presence, and that he did not leave the residence.   The following morning, according to Walder, she was in bed with Taylor when Taylor's "mama wake him up like, 'Don-Don, that boy you be with on TV.' That's what she said."

{¶ 34}   Gujuan Payton testified that he is Taylor's brother.   He testified that he saw Taylor at "[a]round like 9:00, 10:00" on December 7, 2007 at the home of his mother where both men lived.   Gujuan testified that he, Taylor, "LaToya, Guquaya and Shabrandia" went to Speedway for snacks at 10:00 p.m.   Payton stated that he and Taylor then played video games until midnight.

{¶ 35}   Taylor testified that he "started selling dope" in the area of Lincoln and Warren Streets in August, 2007, and that "at first it was just me and JB."   Taylor stated that

he went to school on December 7, 2007, but that he left early because he and Walder had argued in the morning after she told him that she was pregnant a few days earlier. Taylor stated that when he left school, he initially "went to another woman's house that was in the area, you know, just to chill out for a minute, clear my head," at "around 4:00." Taylor stated that he was "over there for a few hours," and that he then went to his mother's residence. Taylor denied going to the area of Lincoln and Warren Streets on the date of the shooting. He stated that after he returned to his mother's home, he did not leave again except to walk to Speedway, after which he "just came home, played the game." The following day, Taylor stated that he "learned it was a shooting down on Lincoln Street" from his mother, and that she told him, "'Somebody just got killed down on where you be at.'" Taylor stated that he learned that the victim was JB "later on that night," after he called Danyelle Allen. Taylor testified that he went to the area of the shooting on Monday "because I wanted answers for real honestly," and that Bryson was his friend.

{¶ 36} Taylor stated that when he was taken to the Safety Building for questioning, he denied using the nickname DonDon because he was afraid that "it had to be some type of secret indictment for selling dope," since "that's what all the crackheads call me." Taylor stated that from 2007 until the present, he has remained the same size. Taylor denied talking to Wright about his case. When shown Exhibit 46, the jacket, Taylor denied that it belonged to him. Defense counsel asked Taylor to try on the parka, and the following exchange occurred at sidebar:

> MR. BRANDT: I'll object, Your Honor, for the record. First, as to
>
> relevance. We're talking about almost three years after the fact.

\* \* \*

MR. BRANDT: And I don't know what relevance it would be whether it fits him now versus if it fit him back in 2007.

MR. SKELTON: Your Honor, the relevance is the entire case to some extent is based on the appearance of this coat on the Defendant. They could argue on cross-examination anything they want, but I think the rules will allow this specific type of evidence to come in.

\* \* \*

MR. BRANDT: He stated that it's not his coat. \* \* \*He was a juvenile then. He's now technically an adult. I just don't understand the relevance it has whether the coat fits him here today when he says it wasn't his.

MR. SKELTON: Okay. Well, Your Honor, I've already had him testify that he was approximately the same height and weight as when he came in. They can cross on that. There's testimony all over this record about the length of the coat.

\* \* \*

MR. SKELTON: It's clearly probative.

\* \* \*

THE COURT: \* \* \*Let me ask this. Has the State had any thoughts about what rebuttal might be required should the Defendant try it on or rebuttal evidence, I mean?

MR. BRANDT: You know, I guess the potential slippery slope of

evidence in terms of witnesses coming in to testify as to what his physical stature was back three years ago.

MR. SKELTON: We have jail records for that if you want.

MR. BRANDT: Jail records, you know, there's an issue of whether that's self-reporting or anything else. I'm talking about actual witnesses. So I didn't anticipate, quite honestly, that the Court would allow him to try it on, so.

THE COURT: I'm going to take a break and figure it out.

* * *

THE COURT: Ladies and gentlemen, the Court has determined that due to the age of the Defendant at the time of the shooting and the potential that the size of the Defendant can change in two years. Mine has, for example, although not in the same direction as we're concerned about. We're not going to allow the Defendant's last request.

{¶ 37} Defense counsel then requested and received permission to videotape Taylor trying on the coat outside of the presence of the jury for purposes of appeal.

{¶ 38} On cross-examination, Taylor testified that Brown worked as a "runner" for him and Bryson. Taylor stated that when the officers approached him on December 11, 2007, near the scene of the shooting, he "was thinking it was for truancy." Taylor stated that the officers asked him if his name was DonDon before they told him that they wanted to interview him about the shooting, and he stated that he lied to get out of trouble for a drug-related offense.

{¶ 39} The prosecutor asked Taylor if he had grown in the last three years, and Taylor stated that he has been "5'11 3/4"" since he was 16 years old. Defense counsel then asked the court again at sidebar to allow Taylor to try on the coat, and the court declined the request.

{¶ 40} After the defense rested, Detective Daborde testified on rebuttal that in the course of an interview with Walder, she identified the coat taken from Taylor's mother as Taylor's coat.

{¶ 41} Immediately before closing statements, the court indicated that upon further review of the issue, it would permit Taylor to try on the parka in the presence of the jury. Counsel for Taylor stated, in part, that the defense is not "going to try to reopen their case and put something into evidence that the Court has already instructed the Jury that they shouldn't consider. * * * ."

{¶ 42} Taylor asserts three assignments of error herein. His first assigned error is as follows:

"TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATED CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION."

"A. The Trial Counsel failed to acquire an expert witness to testify as to the possible reliability issues of witnesses that were under the influence of crack-cocaine during the commission of the crime."

"B. Trial Counsel failed to state to the members of the jury that Mr. Brown was not

seen at the scene of the crime described by the other two State's eyewitnesses."

"C. The Trial Counsel failed to obtain and/or request evidence that could have supported the Defendant's Alibi."

**{¶ 43}** As this Court has previously noted:

We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, and adopted by the Supreme Court of Ohio in *State v. Bradley* (1989), 42 Ohio St.3d 136, * * *. Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.* Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. (Internal citation omitted). *State v. Mitchell*, 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31.

**{¶ 44}** In his brief, Taylor initially asserts that defense counsel's performance fell below an objective standard of reasonableness in that he failed to request funds for an expert

witness on the issue of the effect of crack cocaine on memory, and that the "lack of an expert witness harmed the Defendant because jurors were not able to obtain reliable information on the effects of recollection for individuals that use crack cocaine." Further, according to Taylor, "the fact that both of the State's main eyewitnesses were using crack-cocaine at the day of the incident shows the need of obtaining an expert witness to testify on its effects in (sic) recollection."

{¶ 45} As the State asserts, "the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel." *State v. Nicholas,* 66 Ohio St.3d 431, 436, 613 N.E.2d 225 (1993). Further, the record reflects that defense counsel filed a "Motion for Funding" on April 16, 2009, in which he requested money for expert witnesses in the areas "relating to cell phone and /or cell site information and/or DNA evidence," and counsel's decision not to seek authorization for further expenditures to address the effect of crack cocaine on memory is a matter of trial strategy. Tamlyn and Brown both indicated that their abilities to perceive and remember the shooting were not impaired by their drug usage, and the degree of consistency in their testimonies, namely that Taylor, wearing a dark jacket with a fur trimmed hood, shot Bryson multiple times, supports their assertions. Their testimony is further consistent with Uloho's testimony regarding the shooting. Finally, Taylor does not indicate the substance of the testimony that an expert on the effect of crack cocaine on memory would have provided, or how the testimony would have altered the outcome of the trial. *See State v. Madrigal*, 87 Ohio St.3d 378, 391, 2000-Ohio-448, 721 N.E.2d 52 (holding, in addressing a claim of ineffective assistance of counsel for failure to obtain expert testimony, that determining what type of

testimony an expert witness "could have provided" to the court "would require proof outside the record, such as affidavits demonstrating the probable testimony," and that such "a claim is not appropriately considered on a direct appeal.") As in *Madrigal*, "resolving this issue in [Taylor's] favor would be purely speculative." *Id*., 390. We conclude that Taylor has not demonstrated ineffective assistance of counsel or prejudice based upon counsel's failure to present expert testimony regarding the effect of crack cocaine on memory.

{¶ 46} Taylor next asserts that defense counsel was "ineffective when he failed to point out major inconsistencies in the testimony of all the eye witnesses." Specifically, Taylor directs our attention to Brown's testimony that he observed Taylor and Bryson arguing inside Tamlyn's home, and Tamlyn's testimony that only Taylor, Bryson, "V" and his girlfriend were inside the home when the argument began. Taylor further directs our attention to Tamlyn's testimony that she did not see anyone other than Taylor and Bryson outside of her home in the course of the shooting, and Uloho's testimony that he only observed the shooter and the victim at the scene. According to Taylor, defense counsel "should have used this information to either illustrate that Mr. Brown['s] or Ms. Tamlyn['s] memory or recollection were faulty or Mr. Brown was not present at the time of the shooting."

{¶ 47} As the State asserts, the record reflects that defense counsel noted the inconsistency in the evidence regarding Brown's presence at the shooting in the course of his opening statement. Defense counsel stated, "first of all, I want you to note that [Tamlyn] is saying consistently that there were only two males at that time." Defense counsel later stated, "Now, I do not believe the State indicated this in their opening, but we

expect that the evidence may be that a witness - that there was another potential witness by the name of Chris Brown. * * *." Later, when mentioning Uloho's testimony, defense counsel stated, "What [Uloho] does say is when he looks out - - he only sees two people. * * * Doesn't see any more than two people. So to the extent that anybody else testifies that there was somebody else there, Uloho refutes that." In the course of his cross-examination of Tamlyn and Uloho, defense counsel adduced testimony from Tamlyn that she did not see Brown at the scene of the shooting until after it was over, and he adduced testimony from Uloho that he only observed the shooter and the victim. Finally, in closing argument, defense counsel stated "that when [Tamlyn] does go down there to where the deceased was laying, she testified that Chris, meaning Chris Brown, was not there, that she saw Chris [later] and he had asked her what had happened, which is inconsistent with what Chris had said later." Given the forgoing, we cannot conclude that defense counsel's performance was deficient for failing to "point out" inconsistencies in the testimony of the witnesses at the scene of the shooting such that Taylor was prejudiced.

{¶ 48} Taylor next asserts that defense counsel's performance was deficient in that he failed to investigate, by means of a subpoena directed to Microsoft Corporation, whether Taylor played video games at the time of the shooting on line. Further, he asserts, in the event that Taylor was not playing on line, defense counsel "should have requested an expert witness in order to inspect the hard drive of the Xbox 360 in order to determine whether there were any saved files or auto saves that would corroborate" Taylor's alibi.

{¶ 49} As the State asserts, there "is nothing in the record to show that Taylor had an account with Xbox Live, or that he was connected to the internet when he claimed he was

playing his Xbox on December 7th." We note that Taylor did not mention an Xbox 360 in the course of his testimony, and that the only mention thereof was Walder's. As the State asserts, Taylor ostensibly could have been playing a video game without connecting to the internet. Further, evidence that any Xbox was online or "saving files" at the time of the shooting would only establish that someone was using the Xbox at that time, not that Taylor was doing so. Finally, Tamlyn, Brown, Harris, and Wynn all place Taylor at or near the scene of the shooting on the evening thereof. Also, Danielle Allen received a phone call from Bryson at around 8:30 on December 7, 2007 that was identified as coming from Taylor's phone. Ineffective assistance of counsel for failure to subpoena Microsoft Corporation and any resulting prejudice therefrom is not demonstrated.

{¶ 50} Since Taylor did not receive ineffective assistance of counsel, his first assigned error is overruled.

{¶ 51} Taylor's second assigned error is as follows:

"TRIAL COURT ABUSED ITS DISCRETION WHEN IT DID NOT ALLOW THE DEFENDANT TO TRY ON STATE EXHIBIT 46 WHICH RESULTED IN A DENIAL OF A FAIR TRIAL."

{¶ 52} We agree with Taylor that the trial court's editorial comments that it "determined that due to the age of the Defendant at the time of the shooting and the potential that the size of the Defendant can change in two years. Mine has, for example, although not in the same direction as we're concerned about," was improper. The trial court, however, reconsidered its ruling prior to closing statements, and Taylor was given and refused the opportunity to try on the jacket in the presence of the jury. Taylor accordingly waived his

argument that the trial court abused its discretion when it denied his request to try on the coat. Finally, we have viewed the video of Taylor trying on Exhibit 46, and the fit of the jacket is as Tamlyn described and as the State represents. Taylor's second assigned error is overruled.

{¶ 53} Taylor's third assigned error is as follows:

"THE PROSECUTOR AND THE COURT ENGAGED IN IMPROPER CONDUCT."

"A. This Court should conclude that the comments regarding sympathy and/or tears were not proper."

"B. The Court engaged in improper conduct when it indirectly stated the Defendant lied."

{¶ 54} Taylor first directs our attention to the following exchange in the course of the prosecutor's closing argument:

MS. CLAYPOOL: * * * Bryson sold drugs. He engaged in illegal activity. Well, let's not forget that he was also a brother, a son, a boyfriend, who was soon to be a father. And there were people in his life who shed tears over his death. They still shed tears today.

MR. SKELTON: Objection.

THE COURT: Approach.

(At sidebar)

MR. SKELTON: Judge, for purposes of the record, as the Court well knows, the issues of sympathy or tears is not proper in a criminal case. And

ingesting into this record of tears and crying statements by this Prosecutor I believe is err. (Sic).

THE COURT: * * * Well, we'll ask the Prosecutor to refrain from it in the future.

{¶ 55} Taylor asserts that "the Court should have granted a mistrial because it would be hard to determine the effects the prosecutorial misstatements would have on the jury." Taylor asserts that he is entitled to a new trial.

{¶ 56} As this Court has previously noted:

The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. * * * The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." * * * To determine whether the prosecutor's statements were prejudicial, we must review closing arguments in their entirety. * * * Prosecutors and defense counsel have a wide degree of latitude during closing arguments to address what the evidence has shown and what reasonable inferences may be drawn from that evidence. * * *. *State v. Black*, 181 Ohio App.3d 821, 2009-Ohio-1629, 911 N.E.2d 309 (2d Dist. 2009).

{¶ 57} We agree with Taylor's assertion that the prosecutor's comments were inappropriate. While the comments regarding the shedding of tears were not relevant to his guilt, we cannot conclude that the comments prejudicially affected Taylor's substantial rights. As the State asserts, the comments were brief and isolated. Upon defense counsel's

objection, the court advised the prosecutor to refrain from further invoking the jury's sympathy. Further, the record reflects that the court instructed the jury that the closing arguments were not evidence, and that the jury "must not be influenced by any consideration of sympathy." "It is presumed that a jury follows the instructions given to it." *State v. Winston*, 2d Dist. Montgomery No. 16760, 2000 WL 1369946, *3 (Sept. 22, 2000). Accordingly, we conclude that any error by the prosecutor is harmless.

**{¶ 58}** Taylor finally asserts that after he testified that his size had not changed since the shooting, the court improperly suggested to the jury that Taylor was untruthful when it refused to allow him to try on the jacket in the presence of the jury, "due to the age of the Defendant at the time of the shooting and the potential that the size of the Defendant can change in two years."

**{¶ 59}** In the course of instructing the jury, the court advised as follows: "If during the course of the trial, the Court said or did anything you consider an indication of the Court's view on the facts, you are instructed to disregard it," and the jurors are presumed to follow the instructions given by the court. Given the substantial evidence of Taylor's guilt, any error in the court's remark is harmless.

**{¶ 60}** There being no merit to the Taylor's third assigned error, it is overruled. The judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, P.J. and HALL, J., concur.


Copies mailed to:

Kirsten A. Brandt
Enrique G. Rivera-Cerezo
Hon. Gregory F. Singer