[Cite as *State v. Taylor*, 2014-Ohio-3647.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                                    :

      Plaintiff-Appellee                           :            C.A. CASE NO.     23990

v.                                                                        :            T.C. NO.    08CR1087

GUDONAVON J. TAYLOR                          :               (Criminal appeal from
                                                                                   Common Pleas Court)

      Defendant-Appellant                       :

                                                                        :

· · · · · · · · · ·

**O P I N I O N**

Rendered on the     22nd     day of      August     , 2014.

· · · · · · · · · ·

KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Assistant Prosecuting Attorney, 301 W.
Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

JAY A. ADAMS, Atty. Reg. No. 0072135, 424 Patterson Rd., Dayton, Ohio 45419
      Attorney for Defendant-Appellant

· · · · · · · · · ·

DONOVAN, J.

{¶ 1}    Defendant-appellant Gudonavon Taylor appeals his conviction and sentence

for three counts of murder, in violation of R.C. 2903.02(A) and 2903.02(B), two counts of

felonious assault, in violation of R.C. 2903.11(A)(2) and 2903.11(A)(1), one count of discharging a firearm on or near prohibited premises, in violation of R.C. 2923.162(A)(3)/(C)(4), and one count of having weapons under disability, in violation of R.C. 2923.13(A)(2), each with a three-year firearm specification. Taylor filed a timely notice of appeal with this Court on April 19, 2010.

{¶ 2}  We have previously set forth the history of the case in *State v. Taylor*, 2d Dist. Montgomery No. 23990, 2013-Ohio-186 ( hereinafter "*Taylor I*"), and repeat it herein in pertinent part:

The events giving rise to this matter occurred on December 7, 2007, when Taylor, also known as DonDon, shot and killed Jerod Bryson, also known as JB, after an argument over drugs and money that began at 116 East Lincoln Street, a boarding house in Dayton, and ended with Bryson's death on nearby Warren Street. Taylor was 18 years old at the time of the shooting.

At trial, Susan Allen, a forensic pathologist from the Miami County Coroner's Office, who performed an autopsy on Bryson, testified that she recovered seven bullets from Bryson's body, namely two from his back, one from his right hand, one from the left side of his chest, one from the right side of his head, one from his pelvis, and one from his neck. She stated that she found 14 separate and distinct entrance wounds to Bryson's body, and she testified that Bryson died of "multiple gunshot wounds of the head and torso."

***

Louise Tamlyn, who was the only resident of 116 Lincoln Street, testified that she allowed Taylor and Bryson to sell drugs from the common area of the home in exchange for crack cocaine. According to Tamlyn, on the evening of December 7, 2007, around 8:00 p.m., Taylor, Bryson, another man named "V," and his girlfriend, Brittany, were drinking and "shooting crap" in the common area of the home when they "commenced arguing." At the time, Tamlyn was in her bedroom, which was adjacent to the common area, with her door open. She stated that "[m]ainly DonDon and JB" were arguing about "[m]oney and territory." Tamlyn stated that she asked them to "quiet down," and when the arguing "erupted louder again," she told everyone to leave. Tamlyn stated that everyone left through the front door, and that Taylor and Bryson continued arguing for 10 or 20 minutes. Tamlyn testified that she went upstairs to use the bathroom, at which time the arguing "seemed to quiet down."

When Tamlyn returned to the first floor, she testified that she heard two gunshots. Tamlyn stated that she looked out of the side window of the home toward the intersection of Lincoln and Warren Streets, and she observed "JB dancing from foot to foot out in the middle of the street," and no one else. Tamlyn stated that she proceeded to her front door, which she opened. Tamlyn stated that she observed "a man in black slacks or jeans and a black parka coat with a fur hood running across the field" across the street

from her home. Tamlyn testified that she observed "JB fall to the ground" at 238 Warren Street. Tamlyn stated that she heard "five to seven shots," and that she "see the man run back through here. And there happens to be a streetlight there and I had my porch light on. I see the side of the face and I see the orange lining and I see DonDon come back through the field." Tamlyn stated that she did not see anyone else besides Taylor and Bryson. Tamlyn stated that the five to seven shots she heard were subsequent to the two she initially heard, and that at the time they were fired, Bryson was on the ground and Taylor was "standing in front of JB." Tamlyn stated that her porch light was on at the time, and that a streetlight also illuminated the area. Tamlyn stated that she was wearing her glasses when she opened her front door.

Tamlyn stated that on the evening of the incident, Taylor was wearing a parka with a fur-trimmed hood and an orange lining, "V" was wearing a "black jacket" without fur around the hood, and Bryson was wearing a "Carhart" jacket that was beige in color. Tamlyn stated that she did not observe a gun in Taylor's possession. She stated that after Taylor ran back across the field, she heard a car door slam "further down Lincoln past my house on the opposite side of the street, and it sounded like it proceeded down toward Main Street."

According to Tamlyn, she bought or was given crack cocaine by both Taylor and Bryson on the date of the incident, and she smoked crack cocaine

twice that day at about 4:30 and 8:00 p.m. Tamlyn stated that a "crack high" lasts about "a half an hour." Tamlyn stated that she was "not at all" high when she heard the gunshots and observed Taylor running across the field. After she heard the car leave the scene, Tamlyn stated that she put her boots on, left her home and approached Bryson, who was "laying on his back" in the area of 238 Warren Street. Tamlyn stated that before she reached Bryson, she observed the owner of a nearby "catering place," known as Benham's, and she asked him to call 911. Tamlyn stated that she then observed a police cruiser, which she flagged down, and she stated that she showed the officer Bryson's body, which had holes "in his head, shoulder and his chest." Tamlyn stated that Bryson was "barely breathing at the time."

According to Tamlyn, Chris Brown approached the scene, and the officers asked her if he was the man who shot Taylor, and Tamlyn responded negatively. Tamlyn stated that she did not observe Brown at the shooting. In speaking with the responding officer on the night of the shooting, Tamlyn testified that she did not tell them everything that she had observed or identify Taylor or Bryson because she was scared. Tamlyn stated that she subsequently provided Taylor's name to police on December 10, 2007, and she identified Taylor in a photo spread at the Safety Building on December 17, 2007. Tamlyn identified State's Exhibit 46 as the coat worn by Taylor on the night of the shooting.

On cross-examination, Tamlyn stated that in the six months prior to

the shooting, she used crack cocaine two or three times a month, and she did not consider her usage to be "regular." She stated that she suffers from bipolar disorder, anxiety and post traumatic stress disorder and takes medication prescribed by a psychiatrist.

Tamlyn stated that she met Brown "through JB and DonDon," and that Brown "had been in and out of the house bringing DonDon and JB customers" on the day of the shooting, and that he had been there "after dark." She stated that Brown arrived on the scene approximately eight minutes after she flagged down the police officer, and that he was alone. Tamlyn stated that Brown asked her what had happened, and that she told him "JB had got shot" while out of the earshot of the police officers. Tamlyn stated that when Taylor ran back across the field, she observed the orange lining of his parka, as well as the side of his face.

On redirect examination, Tamlyn stated that on the night of the shooting, "V" and Brown wore jackets that came to their waists, and that Taylor's jacket was below the waist. Tamlyn acknowledged that at a probable cause hearing on March 11, 2008, she described Taylor's coat as "'a black thigh-waist hooded parka.'"

On recross-examination, Tamlyn stated that she closed her front door when Taylor ran back across the field after shooting Bryson, because he would have been able to see her face since the area was illuminated by the streetlight and porch light. She stated that the crack cocaine that she smoked

on the day of the incident in combination with her prescription medication did not affect her ability to perceive, understand and remember the events of the evening.

Chris Brown testified that he witnessed the shooting. At the time of trial, he was incarcerated at the Montgomery County Jail. He testified that on the night of the shooting, in exchange for crack cocaine, he was acting as a "runner," bringing customers to Bryson and Taylor to purchase crack cocaine. Brown stated that he smoked some crack that night which Bryson and Taylor gave him, and that at that time he was smoking crack every day. On December 7, 2007, Brown stated that Taylor was dropped off by his step-father at the Lincoln Street address. Brown testified that on that date he was present inside the Lincoln Street address with Taylor, Bryson, "V," and his girlfriend, Brittany. Regarding the argument that preceded the shooting, Brown testified that "JB break up V and his girl from fighting. And then he start getting at DonDon and everything, and then he threaten DonDon, said he was going to get his gun and bring it down there and do something." Brown stated that Bryson and Taylor argued about money from the drug sales. After Tamlyn told them to leave, Brown stated that Taylor, "V" and his girlfriend got into a car and left "for like six minutes." Brown stated that when the vehicle returned, Taylor got out of the car, and Brown stated that he walked towards Taylor and said "'Man, you need to let everything go.'" Brown stated

that Taylor "kept walking, and JB was standing right there," and Taylor shot Bryson. According to Brown, Bryson "get back up and cross the street. He was on his cell phone. And I seen DonDon went back across following behind him and pushed him down to shoot him some more." Brown stated that he heard a total of eight shots. Brown stated that he "went towards like the Gospel Mission. I went up a little more till I seen [Taylor] run back across field and get in the car and they took off."

Brown testified that after Taylor drove away, he "went back slowly to the corner. Then I crossed over and went checking on him. And I was scared like walking up on him and I was - - just started crying. And the police pulled up, told me to put my hands up." Brown stated that he did not see Tamlyn as he approached Bryson. Brown stated that he was placed in a cruiser and was not truthful to officers about what he had seen. Brown stated that he observed Tamlyn when he was in the back of the cruiser. He stated that he was arrested on an outstanding warrant, and that he later told the police that Taylor killed Bryson. Brown stated that Taylor wore dark clothes and a "jacket with a hoodie with fur around it" on the date of the shooting. Brown identified Exhibit 46 as Taylor's jacket. Brown stated that the crack cocaine he smoked did not affect his ability to perceive and remember the shooting.

Finally, Brown testified that he had contact with Taylor in the Montgomery County Jail within the last two weeks before trial, and Brown

stated that Taylor told him, "'Don't testify' - - he said my name was in his discovery packet. He said don't testify against him because his life is on the line. And he said if I - - if I don't testify against him he'll have his girl put $40 on my books."

Larry Harris testified that at the time of the shooting, he resided at the Marvin Gardens Apartments on Warren Street, on the second floor. Harris stated that he knew Bryson and Taylor and had bought crack cocaine from them on Lincoln Street. He testified that Taylor and "V" came to his apartment at about 6:00 p.m. on the date of the shooting, and that they "started to gamble. Smoking weed, drinking." Harris stated that Albert Wynn, who is Bryson's brother, also came by his apartment. Harris stated that he owed Wynn five dollars, and that he gave him the money and told him to leave. He stated that his landlord appeared at about 9:00 p.m., and that she told Taylor and "V" to leave. Harris stated that he later went to the hospital and was not home when the shooting occurred.

Robert Hankey testified that he is a director of an alternative education program called Twilight School at Wayne High School, and that the program is offered from 3:00 to 5:00 p.m. Hankey stated that Taylor was a student in the program, and that on the date of the shooting, Taylor "took a half-day and he was dismissed early" at 4:00.

Michael Daborde testified that he is a homicide detective with the Dayton Police Department, and that he conducted a follow-up investigation

of the shooting. Daborde stated that while he was interviewing Taylor, on December 11, 2007, Taylor's mother arrived at the Safety Building "wearing a coat that fit a description that we had had from the initial scene of the homicide." He stated that the coat "was black with a fur hood." According to Daborde, the coat "didn't appear to fit her. So we thought that to be strange." Daborde testified that he took the coat from Taylor's mother, and he identified Exhibit 46 as that coat.

Albert Wynn testified that Bryson was his younger brother. Wynn testified that he went to the home of Larry Harris, "to collect money on a drug debt" on December 7, 2010, at approximately 6:30 p.m. At the time, Wynn stated that he observed Taylor at the apartment with "V" shooting dice. He further stated Bryson stopped by the apartment while he was there, and that he and Bryson left the apartment together and then went their separate ways, with Bryson walking toward Lincoln Street.

Danyelle Allen, Bryson's girlfriend, testified that she received a call on her cell phone from Bryson at around 8:30 p.m on December 7, 2007, and according to her caller ID, the call was placed from Taylor's cell phone.

Adrian Uloho testified that he witnessed a shooting on December 7, 2007, from his apartment on Warren Street. He stated that he looked out of his window and observed two men across the street, and that one of the men shot the other one. He stated that the area where the men stood was well lit. Uloho stated that after the man was shot, he got up and walked in the

direction of Uloho's apartment. According to Uloho, the shooter followed the victim, and the "guy that got shot, when he sees him, he falls to the ground." Uloho stated that he heard the shooter say, "Did I get you?" and "Why did you try to play me?" Uloho stated that he did not observe anyone else in the area except the shooter and the victim. Uloho stated that after the victim fell to the ground, the shooter stood over him and shot him at least four more times. Uloho then observed the shooter "running across the street."

On cross-examination, Uloho stated that he had met Bryson once before, but he did not see his face well enough to identify him on the night of the shooting.

Dayton Police Detective Michael Galbraith testified that he was dispatched to the scene of the shooting on December 7, 2007, after 11:00 p.m, and that when he arrived, Bryson's body had already been removed. Galbraith stated that the area was well lit, and he observed footprints in the snow heading in the direction of Lincoln Street from Warren. Galbraith testified that the Dayton Police have a policy to not release the name of homicide victims until after their family is notified, and that Bryson's family was notified on the 8th of December, and that the shooting was reported in the Dayton Daily News on the 9th of December. Galbraith stated that he interviewed Tamlyn on December 10, 2007, and that she provided Taylor's name to him. Galbraith stated that he interviewed Taylor on December 11, 2007, after he observed him talking on his cell phone on Warren Street where

Galbraith had returned to continue the investigation. Galbraith stated that when he observed Taylor at that location, he called for additional officers, and when approached, Taylor identified himself as Gudonovan Taylor and agreed to go with the uniformed officers to the station.

After advising Taylor of his *Miranda* rights, Galbraith questioned Taylor about his presence at the scene of the crime on December 7, 2007, and his use of the name DonDon, both of which Taylor denied. Taylor's mother arrived in the course of the interview, and Galbraith "immediately noticed that she was wearing an oversize parka" that was "too big for her and it was dark colored with fur around the collar." Galbraith stated that he and Daborde "conferred about it and both thought that it was very like and similar to one that was described." Galbraith stated that he advised Taylor's mother that the coat "appeared to be evidence at this point and that I needed it." Galbraith took possession of the coat, and he identified it as State's Exhibit 46. Galbraith stated that he interviewed Tamlyn on December 17, 2007, and that she identified Taylor in a photo spread of six photos "right away."

James Wright testified that in November, 2009, while he was incarcerated at the Montgomery County Jail, he came into contact with Taylor, from whom he had previously bought drugs. Wright heard Taylor state that he had returned to the Lincoln Street address after Bryson's murder, and that "he seen that the detectives were there. So, he proceeded up the street to the phone, he didn't say what kind of phone. He just said the phone.

And he said then he seen an unmarked cruiser coming towards him so he got rid of the weapon that he had." Wright stated that Taylor indicated that detectives approached him and questioned him. Wright stated that Taylor also "said he was going to have his family come in and say he did not have his cell phone with him. He did not have his cell phone, he loaned it to a friend and that he going to - - that they were going to say he was at his mother's house."

Taylor, who was nineteen at the time of trial, presented an alibi defense. Latoya Stewart testified that Taylor is the brother of her boyfriend, Gujaun Payton. She stated that she saw Taylor on December 7, 2007 at his mother's house in Huber Heights. According to Stewart, she went to the home after school to spend the weekend with Payton. She stated that she arrived "after 6:30, maybe 7:00," and that Taylor arrived 30 minutes later. Stewart testified that upon her arrival, Shabrandia Walder, Taylor's girlfriend, "had did my hair in the bathroom." According to Stewart, Taylor's "mom was cooking dinner, chicken. We walked to Speedway to get some snacks." She stated that she, "Gujuan, Gudonavon, Guquaya, and Shabrandia" walked to Speedway together. Afterward, they returned home for dinner, and "then my boyfriend and Gudonavon played a game in his room. We all just played a game and laid down and watched TV." Stewart stated that they stayed up until 12:00, and that Taylor never left the residence.

Shabrandia Walder testified that she is Taylor's girlfriend. She stated that Taylor lives in Huber Heights with his "mother, Gloria Close, Tommy Close, his stepfather, his little brother, Elsie Lorenzo Close, his sister, Guquaya Payton." In December, 2007, Walder stated that she was "staying over there at Gloria Close's house." On December 7, 2007, Walder stated that Taylor arrived at the home at "around 8:00" p.m., and that she "was still doing my hair because I had just finished doing Latoya's hair. I was doing my hair in the restroom. He walked in, said, 'What's up?' He went in his room and played the video game for a while. And then after I finished up a little with my hair, we both walked to Speedway, all of us." After returning to the home and having dinner, Walder stated "we all came in Don-Don's room and played the game" on Taylor's "Xbox 360 * * * Something like that." Walder stated that she did not leave Taylor's presence, and that he did not leave the residence. The following morning, according to Walder, she was in bed with Taylor when Taylor's "mama wake him up like, 'Don-Don, that boy you be with on TV.' That's what she said."

Gujuan Payton testified that he is Taylor's brother. He testified that he saw Taylor at "[a]round like 9:00, 10:00" on December 7, 2007 at the home of his mother where both men lived. Gujuan testified that he, Taylor, "LaToya, Guquaya and Shabrandia" went to Speedway for snacks at 10:00 p.m. Payton stated that he and Taylor then played video games until midnight.

Taylor testified that he "started selling dope" in the area of Lincoln

and Warren Streets in August, 2007, and that "at first it was just me and JB." Taylor stated that he went to school on December 7, 2007, but that he left early because he and Walder had argued in the morning after she told him that she was pregnant a few days earlier. Taylor stated that when he left school, he initially "went to another woman's house that was in the area, you know, just to chill out for a minute, clear my head," at "around 4:00." Taylor stated that he was "over there for a few hours," and that he then went to his mother's residence. Taylor denied going to the area of Lincoln and Warren Streets on the date of the shooting. He stated that after he returned to his mother's home, he did not leave again except to walk to Speedway, after which he "just came home, played the game." The following day, Taylor stated that he "learned it was a shooting down on Lincoln Street" from his mother, and that she told him, "'Somebody just got killed down on where you be at.'" Taylor stated that he learned that the victim was JB "later on that night," after he called Danyelle Allen. Taylor testified that he went to the area of the shooting on Monday "because I wanted answers for real honestly," and that Bryson was his friend.

Taylor stated that when he was taken to the Safety Building for questioning, he denied using the nickname DonDon because he was afraid that "it had to be some type of secret indictment for selling dope," since "that's what all the crackheads call me." Taylor stated that from 2007 until the present, he has remained the same size. Taylor denied talking to Wright

about his case.

\*\*\*

On cross-examination, Taylor testified that Brown worked as a "runner" for him and Bryson. Taylor stated that when the officers approached him on December 11, 2007, near the scene of the shooting, he "was thinking it was for truancy." Taylor stated that the officers asked him if his name was DonDon before they told him that they wanted to interview him about the shooting, and he stated that he lied to get out of trouble for a drug-related offense.

\*\*\*

Following a jury trial on all charges except having weapons while under disability, Taylor was found guilty of each offense and specification. Following a bench trial, Taylor was found guilty of having weapons while under disability. The court sentenced Taylor to an aggregate term of [forty-one] years to life.[1]

{¶ 3} Taylor's appeal was originally filed on April 19, 2010. Pursuant to *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.E.2d 493 (1967), original appellate counsel for Taylor asserted that there were no meritorious issues for review. Taylor then filed a pro se brief, asserting nine assignments of error, and an amended brief, asserting one additional assignment of error. We concluded that six of Taylor's assigned errors had arguable merit.

---

[1]We note that the trial court merged Taylor's two convictions for felonious assault and his two convictions for murder prior to sentencing.

We, therefore, appointed new appellate counsel for Taylor, who filed a merit brief on August 6, 2012, asserting three errors for our review. We affirmed Taylor's conviction and sentence in an opinion issued on January 25, 2013. See *Taylor I.*

{¶ 4} On April 8, 2013, Taylor filed a motion to reopen his appeal based on ineffective assistance of appellate counsel. We initially denied Taylor's motion to reopen in an opinion issued on May 21, 2013. On July 10, 2013, however, we reconsidered our decision denying his motion and allowed Taylor to reopen his appeal. New appellate counsel was appointed to represent Taylor and his merit brief was subsequently filed on March 17, 2014.

{¶ 5} Taylor's appeal is now properly before this Court.

{¶ 6} Taylor's first assignment of error is as follows:

{¶ 7} "THE TRIAL COURT ERRED IN IMPOSING A SENTENCE SEPARATELY FOR ALLIED OFFENSES."

{¶ 8} In his first assignment, Taylor contends that the trial court erred when it failed to merge his convictions for felonious assault and murder. Specifically, Taylor points out that there was only one victim in this case, and he asserts that the felonious assault was not committed separately from the murder. Rather, Taylor argues that both offenses were committed as a single course of conduct with a single animus.

{¶ 9} The merger of offenses is governed by R.C. 2941.25, which is a "prophylactic statute that protects a criminal defendant's rights under the Double Jeopardy Clauses of the United States and Ohio Constitutions." *State v. Johnson,* 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 45. R.C. 2941.25 provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 10} The defendant bears the burden to prove entitlement to merger. *State v. Thomas,* 10th Dist. Franklin No. 10AP-557, 2011-Ohio-1191, ¶ 16.

{¶ 11} In *Johnson,* the Supreme Court of Ohio announced a new manner of applying R.C. 2941.25 to determine when offenses are allied offenses of similar import that must be merged.  It abandoned the previous test, set forth in *State v. Rance*, 85 Ohio St.3d 632, 710 N.E.2d 699 (1999), which called for a comparison of the statutory elements solely in the abstract.  *Johnson* held that, when determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered. *Id.* at ¶ 44.   The Supreme Court explained:

In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other.  *State v. Blankenship* (1988), 38 Ohio St.3d 116, 119.   (Whiteside, J., concurring) ("It is not

necessary that both crimes are always committed by the same conduct but, rather, it is sufficient if both offenses *can be* committed by the same conduct. It is a matter of possibility, rather than certainty, that the same conduct will constitute commission of both offenses." [Emphasis sic] ). If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." *State v. Brown,* 119 Ohio St.3d 447, 2008-Ohio-4569, at ¶ 50 (Lanzinger, J., dissenting).

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R .C. 2941.25(B), the offenses will not merge.

*Johnson* at ¶ 48–51.

{¶ 12} In the instant case, Taylor argues that his offenses should have merged because his actions in committing the felonious assault and the murder were committed with a single animus against only one victim. The facts before us support the trial court's

determination that the felonious assault and the murder of Bryson were not subject to merger. We recognize that a defendant's infliction of multiple wounds in rapid succession may constitute a single act with a single animus for purposes of an allied-offense analysis. *See*, *e.g.*, *State v. McClendon*, 2d Dist. Montgomery No. 23558, 2011-Ohio-5067 (involving a defendant who shot the victim five times in rapid succession). However, in *State v. Rainer*, 2d Dist. Montgomery No. 25091, 2013-Ohio-963, we found that the trial court correctly distinguished between the initial knife blows that the appellant inflicted inside the bar and the final blow he inflicted to the victim's back when she fled the bar area and attempted to escape. The temporal separation between the knife blows, albeit slight, establishes separate acts of felonious assault. This court reached a similar conclusion in *State v. Wilson*, 2d Dist. Montgomery No. 22120, 2008-Ohio-4130, reasoning:

> The evidence in this case demonstrates that Defendant committed two separate and distinct felonious assaults against D'Laquan Phillips, and then murdered him. The initial felonious assault occurred when Michael Phillips heard a gunshot and looked up to see his nephew, D'Laquan Phillips, struggling with Defendant. Although it is unclear from the record whether this first shot struck D'Laquan Phillips, this conduct corresponds to count four of the indictment which charged that Defendant caused or attempted to cause physical harm with a deadly weapon. This first felonious assault was completed before Defendant committed the second felonious assault, which occurred when Defendant shot D'Laquan Phillips in the back as Phillips attempted to flee. This shot struck and incapacitated him. The coroner

testified that after being shot in the back, D'Laquan Phillips was paralyzed from the chest down. This conduct corresponds to count three which charged that Defendant caused serious physical harm. This second felonious assault was completed before Defendant stood over D'Laquan Phillips and shot him multiple times in the head, purposely causing his death.

Under these circumstances, we conclude that the felonious assaults were committed separately from and prior to the purposeful murder, and therefore Defendant may be convicted and sentenced for all of those offenses.

*Id.* at ¶¶43-44.

{¶ 13} Upon review, we conclude that the evidence adduced at trial established that Taylor committed a separate and distinct felonious assault against Bryson and then murdered him. Specifically, there were two separate shootings in two separate locations. The first shooting occurred at the intersection of Lincoln and Warren Streets, just outside of Tamlyn's house. After the first round of gunshots, during which he was struck several times, Bryson was able to get up and walk diagonally across the street to 238 Warren Street where he fell down. At that point, Taylor walked over to where Bryson had fallen and shot him several more times at almost point blank range in the head and upper torso. Bryson subsequently died where he had fallen in front of 238 Warren Street. While the evidence established that Bryson was shot fourteen times, the testimony provided by the coroner, Dr. Allen, established that the shots that killed Bryson were the ones fired by Taylor in front of the 238 Warren Street address. Similar to our findings in *Wilson*, the evidence in the instant case establishes that the felonious assault occurred and was completed during the first non-fatal

round of gunshots in front of Tamlyn's residence located at 116 East Lincoln Street. From there, Bryson was able to get up and walk over to 238 Warren Street where he fell down and the second round of gunshots was initiated by Taylor that ultimately brought about Bryson's death. Under these circumstances, we conclude that the felonious assault was committed separately from and prior to the murder, and therefore, Taylor was properly convicted and sentenced for both of those offenses. Accordingly, the trial court did not err when it refused to merge Taylor's separate convictions for felonious assault and murder.

{¶ 14} Taylor's first assignment of error is overruled.

{¶ 15} Taylor's second assignment of error is as follows:

{¶ 16} "THE TRIAL COURT ERRED IN DENYING APPELLANT A FAIR TRIAL PURSUANT TO THE OHIO AND UNITED STATES CONSTITUTION BY COMMENTING ON THE EVIDENCE TO THE PREJUDICE OF APPELLANT."

{¶ 17} In his second assignment, Taylor argues that the trial court erred when it denied his request to try on the parka (State's Ex. 46) in the presence of the jury. Taylor also asserts that the trial court's subsequent comment to the jury that "people can change sizes over time" was an attack on his credibility.

{¶ 18} Initially, we note that Taylor previously advanced both of these arguments in his original appeal. We addressed both arguments in *Taylor I*. Specifically, we found that Taylor waived his argument that the trial court abused its discretion when it did not allow him to try on a jacket in the presence of the jury. *Id*. Significantly, the court later reversed its ruling before the end of the trial and allowed Taylor to try on the jacket. *Id*. Nevertheless, Taylor declined the opportunity to try on the jacket in the jury's presence.

With respect to the comment made by the trial court to the jury regarding Taylor's potential change in size, we found that the comment was improper. *Id*. However, we found that the error was harmless in light of the trial court's instruction to disregard any remarks by the court that the jury considers an indication of the court's view on the facts, which the jury is presumed to follow. *Id*.

{¶ 19} Furthermore, the doctrine of res judicata provides that "[a] valid, final judgment rendered on the merits bars all subsequent actions based on any claim arising out of the transaction or occurrence that was the subject matter of the previous action." *Grava v. Parkman Township*, 73 Ohio St.3d 379, 381, 653 N.E.2d 226 (1995), syllabus. The doctrine, as applied to claims, has historically been called estoppel by judgment in Ohio. *Id*. Res judicata is not a basis for dismissal of a claim. Rather, it is a basis on which courts rely to preclude adjudication of a claim or claims.

{¶ 20} We granted Taylor's motion to reopen so that he could pursue additional assignments that should have been raised in his original appeal. However, Taylor has already advanced these arguments which we fully considered and overruled in *Taylor I*. Thus, Taylor's assignment is clearly barred by res judicata, and we do not reach the merits of his arguments.

{¶ 21} Taylor's second assignment of error is overruled.

{¶ 22} Taylor's third assignment of error is as follows:

{¶ 23} "APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE OHIO AND UNITED STATES CONSTITUTION."

**{¶ 24}** In his third assignment, Taylor argues that he received ineffective assistance when his trial counsel failed to question Chris Brown regarding any deal he may have entered into with the State in exchange for his testimony at trial. Taylor also asserts that his counsel was ineffective for eliciting information from a witness that Taylor was in jail prior to trial.

**{¶ 25}** "We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley* (1989), 42 Ohio St.3d 136, * * * . Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.* Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." (Internal citation omitted). *State v. Mitchell*, 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31.

**{¶ 26}** Taylor first argues that he received ineffective assistance when his trial counsel failed to cross-examine Brown regarding an answer he gave during his testimony about whether he had made any deals with the State. The written transcript from the trial establishes that Brown answered "Yes, sir," when he was asked by the prosecutor, "Has the

prosecutor's office, myself, or Ms. Claypool made you a deal or promised you something in exchange for testifying today?"

{¶ 27} The record, however, establishes that on January 25, 2012, the State filed a motion to have the trial court record corrected pursuant to App.R. 9(E). In its motion, the State argued that the written trial transcript was incorrect as Brown had actually answered "No, sir," when he was asked by the prosecutor whether the State had offered any deals or made any promises to him in exchange for his testimony. We remanded the matter to the trial court, the video record was examined by the trial court and it was determined that the error noted by the State did, in fact, exist. The trial court ordered the written transcript to be corrected to reflect that Brown had answered "No, sir." An entry correcting the trial record was filed with this Court on April 18, 2012.

{¶ 28} Because Brown actually answered in the negative when asked whether the State had offered him any deals or made him any promises in exchange for his testimony, there was nothing for Taylor's trial counsel to inquire of Brown in that regard. Thus, Taylor cannot demonstrate that his trial counsel was ineffective for failing to follow up on a negative response.

{¶ 29} In the second portion of this assignment, Taylor argues that his trial counsel was ineffective for referencing the fact that appellant was incarcerated when he allegedly bribed Brown so that he would not testify for the State. During Brown's direct testimony, the following exchange occurred:

> The State: Since you been in jail, Chris, have you seen [Taylor]?
>
> Brown: Yes.

The State: May I approach for a second, please?

The Court: Yes.

(At sidebar)

Defense Counsel: Your Honor, on behalf of the Defendant, it's my understanding that the prosecution will attempt to solicit evidence from this witness that he has seen [Taylor] since he's been incarcerated over at the jail within the last two to three weeks and that my client has – well, you tell him what you expect the testimony –

The State: I'd expect the testimony to be, Judge, that this witness saw [Taylor] in the jail kind of happenstance. [Taylor] pulled him aside and told him not to tell on him in this case and that if he agreed not to testify that he would have another individual put money on his books for him.

The Court: And the basis for the – I assume you're objecting to that?

Defense Counsel: Yes, Your Honor. I'm objecting to that. The – the basis would be the witness, as I understand, is going to make – is – a statement that my client made. Your position would be it's not hearsay because it's an admission of a party opponent, correct? Go ahead. You were going to say something else.

The State: Well, yeah. And it's also a statement against interest. I mean it's a clear attempt to bribe, for lack of a better way to say it.

The Court: I –

Defense Counsel: I think it's too –

The Court: I don't like the idea but – are you going to put a time frame on

this?

The State: I think he'll talk about it being approximately a week or two ago.

Defense Counsel: I just think it's too prejudicial to come in. I understand that bad things are prejudicial against the defense, Your Honor, but the statement of this witness exactly is going to be if what – if he – I just want to be clear for the record. What did you anticipate it to be again?

The State: I anticipate that it's going to be that he pulled him aside and said, "You can't – don't tell on me. You can't tell on me," and that there was an offer made to put money on his books if he agreed not to tell on him.

Defense Counsel: Uh-huh.

The State: I just don't know what basis there is. I understand what you're saying, that it's prejudicial, but it's no more or less prejudicial than –

Defense Counsel: Tell on him for what?

The Court: The only thing that bothers me is a more minor matter, and that is that he's apparently in jail at the same time as this guy. He's already been established as being there since February. But I think the testimony is appropriate. I – if you can induce this testimony without further reference to the Defendant being in jail, then for whatever that's worth we'll allow it, okay.

(End sidebar)

The State: Chris, when did you last see [Taylor]?

Brown: When I was going to court.

Q: When were you going to court? And how long ago was that from today's date?

A: About a week and a half ago.

Q: And what happened at that time?

A: He pulled me to the side.

Q: [Taylor] pulled you to the side?

A: (Nods head affirmatively)

Q: And did he say anything to you at that time?

A: Yes, sir.

Defense Counsel: Objection.

The Court: Overruled.

Q: What did he say to you, Chris?

A: He told me he was going to – he said I was in his discovery packet and all this and that, and he said. "Don't testify against me because his life on the line."

***

Q: Speak up, tell us again. What did he tell you?

A: He said, "Don't testify" – he said my name was in his discovery packet. He said don't testify against him because his life is on the line. And he said if I – if I don't testify against him he'll have his girl put $40.00 on my books.

Q: If you don't testify against him he'd have his girl put $40.00 on

your books.   Does that mean put – give you money in jail?

A: Yes, sir.

{¶ 30}   During Brown's cross-examination, the following exchange occurred between Brown and defense counsel:

Defense Counsel: When you testified in response to the prosecution's questions *about meeting [Taylor] in the jail just recently –*

Brown: Right.

Defense Counsel: – isn't it true that [Taylor] said to you that your name had appeared in his discovery packet which would be the police reports?

Brown: Yes, sir.

{¶ 31}   Initially, we note that defense counsel's comment regarding Brown "meeting Taylor in the jail" would cause a reasonable juror to conclude that appellant was incarcerated immediately prior to trial.   Nevertheless, we find that defense counsel's comment does not rise to the level of ineffective assistance.   When the trial court permitted the State to question Brown regarding the bribe offered to him by Taylor, it understood the potential danger in that the jury might be unable to ignore the inference that both men were incarcerated when the conversation occurred.   The jury was already aware that Brown had been in jail since February before the trial began.   Moreover, defense counsel was presented with a Hobson's Choice insofar as he had no alternative but to cross-examine Brown concerning the alleged bribe offered by Taylor.   Defense counsel's question in which he acknowledged that Brown and Taylor conversed while both men were in jail was a misstep,

but standing alone it does not rise to the level of ineffective assistance of counsel. Without conceding that defense counsel's conduct fell below an objective standard of reasonableness, we cannot find that, but for the comment, the result of the trial would have been different.

{¶ 32} Taylor's third assignment of error is overruled.

{¶ 33} Taylor's fourth assignment of error is as follows:

{¶ 34} "PROSECUTORIAL MISCONDUCT COMMITTED DENIED APPELLANT HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL AS GUARANTEED BY THE OHIO AND UNITED STATES CONSTITUTION."

{¶ 35} In his fourth assignment, Taylor contends that several remarks made by the State during its opening statement amounted to prosecutorial misconduct. Specifically, Taylor argues that the prosecutor made improper statements about how he allegedly ran from the scene of the shooting and lied to police about his identity and whereabouts at the time of the shooting. Taylor also points out that during the opening statement, the prosecutor indicated to the jury that Louise Tamlyn had previously made false statements to police regarding the shooting because she was scared. The prosecutor then stated that Tamlyn eventually "came clean" because "it was the right thing to do." Taylor argues that these statements are improper because they amount to the State vouching for the credibility of a witness.

{¶ 36} All of the alleged prosecutorial misconduct identified by Taylor occurred during the State's opening statement. "Generally, prosecutors are entitled to considerable latitude in opening and closing arguments." *State v. Whitfield*, 2d Dist. Montgomery No. 22432, 2009–Ohio–293, ¶ 12. *Accord State v. Ballew*, 76 Ohio St.3d 244, 255, 667 N.E.2d

369 (1996). The trial court generally determines the propriety of statements made during opening statement. *State v. Loza*, 71 Ohio St.3d 61, 641 N.E.2d 1082 (1994). Opening statement is not evidence but is intended to advise the jury of what counsel expects the evidence to show. *State v. Turner*, 91 Ohio App.3d 153, 631 N.E.2d 1117 (1st Dist.1993). As such, the prosecutor and defense counsel may, in good faith, make statements as to what they expect the evidence will show. *Id.*

{¶ 37} The test for prosecutorial misconduct is whether the remarks were improper, and if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The question is whether the prosecutor's misconduct so infected the accused's trial with unfairness that the accused's convictions came in violation of the right to due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 644, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

{¶ 38} During the State's opening statement, the following exchange occurred:

The State: Now, throughout this trial, you'll also hear testimony about the various efforts the Defendant made to avoid responsibility and cover up his crime, starting from the time that he ran away from the scene.

Defense Counsel: Objection.

The Court: Approach.

(At sidebar)

The Court: Basis?

Defense Counsel: I think it's improper to make any statements that the Defendant (indiscernible) anything could be inferred by conduct of the Defendant running away from the scene.   I don't know that there is evidence that he ran away from the scene.   So –

The State: (Indiscernible) evidence he ran away from the body of J.B. I think there's a jury instruction that says flight can be inferred (indiscernible) right on line.

Defense Counsel: Objection for the record, Your Honor.

The Court: Yes, overruled.   Based on the representation by Counsel that there will be evidence to that effect.

Defense Counsel: Okay.

(End sidebar)

The Court: You may proceed.

The State: You will hear evidence about efforts the Defendant made to avoid responsibility and cover up his crime, starting with the time that he ran away from the scene, running away from J.B.'s body.   And continuing on to his first interaction with the Dayton Police Department.

\*\*\*

[Taylor] then makes statements, lying about his whereabouts.   And he even denies that he is called DonDon.   He wouldn't even be truthful about his own nickname.

**{¶ 39}**   The record establishes that the State presented evidence which supports all

of the statements made by the prosecutor regarding Taylor's efforts to avoid being found and apprehended by the police. Brown testified that after he observed Taylor gun down Bryson, the appellant "[ran] back across the field and get in a car" and leave the area. Det. Galbraith testified that when he asked Taylor if his nickname was DonDon, he said no. When Det. Galbraith asked Taylor where he was when the shooting occurred, he indicated that he was at home with his mother and girlfriend and that he had not been at the scene for two days prior to the shooting. When he testified, Taylor admitted that he lied to police regarding his nickname. Larry Harris and Albert Wynn, Jr. both testified that they interacted with Taylor near the scene of the shooting on the day Bryson was killed. Both Brown and Tamlyn testified they observed Taylor shoot Bryson at the intersection of Lincoln and Warren and in front of 238 Warren. The prosecutor's opening statements regarding Taylor's repeated deceptions were not personal opinion and did not improperly prejudice his case. Rather, the prosecutor told the jury what she anticipated the evidence would establish. More importantly, all of her statements were supported by evidence adduced at trial. The prosecutor's statement, "he won't even be truthful about his own name," was not proper for opening statement, but more appropriate closing argument. However, this statement standing alone does not constitute prosecutorial misconduct.

{¶ 40} Upon review, we also conclude that the prosecutor's remarks regarding Tamlyn did not impermissibly vouch for the credibility of the witness. The prosecutor stated the following in pertinent part:

> Police spoke to Louise Tamlyn that evening. And she told them part
>
> of what she saw. She described the shooter. She described the shooting.

But out of fear, she left a few things out. Although she was able to describe the shooter, on that evening, it wasn't until three days later when the police interviewed her again that she told them she knew him and his name was DonDon. Within three days, she also told them that she knew the victim too and his name was J.B. She also didn't tell them about the selling of the drugs in her apartment or that she'd done crack cocaine that evening. *But she ultimately came clean, even telling them about the things that didn't make her look very good and could have gotten her in trouble. And she did that because it was the right thing to do.*

**{¶ 41}** Initially, we note that defense counsel did not object to the prosecutor's statements about Tamlyn. Taylor has therefore waived all error except plain error. *State v. Coffey*, 2d Dist. Miami No. 2006CA6, 2007-Ohio-21, at ¶14. To prevail under the plain error standard, an appellant must demonstrate both that there was an obvious error in the proceedings and that but for the error, the outcome of the trial clearly would have been otherwise. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88.

**{¶ 42}** Taylor argues that the prosecutor's comments regarding Tamlyn "coming clean" and "doing the right thing" were improper and demonstrate that she was personally vouching for Tamlyn. A prosecutor "cannot say, 'I believe these witnesses,' because such argument invades the province of the jury, and invites the jury to decide the case based upon the credibility and status of the prosecutor." *State v. Smith,* 14 Ohio St.3d 13, 470 N.E.2d 883 (1984). "A prosecutor's statement on witness credibility is not an improper voucher where it neither implies knowledge of facts outside the record nor places the prosecutor's

personal credibility at issue." *State v. Miller*, 4th Dist. Washington No. 06CA11, 2007-Ohio-427, at ¶ 24, citing *State v. Keen*, 81 Ohio St.3d 646, 666, 693 N.E.2d 246 (1998). This statement by the prosecutor does not improperly vouch for Tamlyn's credibility at the time she made a statement to police implicating Taylor. The prosecutor was entitled to state what she expected the evidence to establish, i.e., that Tamlyn had been untruthful in her initial statement to police because she was fearful of being arrested for her own drug use and explicit approval of the sale of drugs out of the common room in her apartment building. Moreover, all of the prosecutor's statements in her opening statement were later attested to by Tamlyn when she testified. Accordingly, we see no prejudice to Taylor as a result of the prosecutor's statements.

{¶ 43} Taylor also argues that the prosecutor committed misconduct by failing to disclose promises made to Brown in exchange for his testimony at trial. As previously noted, the record establishes that the State did not enter into any deals or promises with Brown. Taylor bases this argument on a portion of the written transcript that was later corrected to reflect the actual testimony. Thus, his argument fails.

{¶ 44} Taylor's fourth assignment of error is overruled.

{¶ 45} Taylor's fifth and final assignment of error is as follows:

{¶ 46} "THE VERDICT OF THE JURY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 47} In his final assignment, Taylor argues that the verdict was against the manifest weight of the evidence.

{¶ 48} When analyzing a challenge to the manifest weight of the evidence, the

court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. McKnight*, 107 Ohio St.3d 101,112, 2005-Ohio-6046, 837 N.E.2d 315. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

{¶ 49} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).

{¶ 50} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997).

{¶ 51} Upon review, we conclude that Taylor's convictions are not against the manifest weight of the evidence. The credibility of the witnesses and the weight to be given

their testimony are matters for the jury to resolve. Taylor presented an alibi defense that the jury apparently rejected. The jury did not lose its way simply because it chose to believe the State's witnesses, which it had a right to do. Having reviewed the entire record, we cannot clearly find that the evidence weighs heavily against a conviction, or that a manifest miscarriage of justice has occurred.

{¶ 52} Taylor's fifth and final assignment of error is overruled.

{¶ 53} All of Taylor's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, P.J. and HALL, J., concur.

Copies mailed to:

Kirsten A. Brandt
Jay A. Adams
Hon. Gregory F. Singer